## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**

**Grand Jury Sworn in on November 3, 2016**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.:** |
| | : | |
| | : | |
| **v.** | : | |
| | : | **VIOLATIONS:** |
| | : | |
| **APICHART SRIVARANON** | : | **18 U.S.C. § 371** |
| **also known as "TER"** | : | **(Conspiracy to Defraud the United States** |
| **also known as "EISENHOWER TER"** | : | **and Conspiracy to Unlawfully Export Arms** |
| **also known as "APICHART** | : | **and Munitions and Smuggle Goods from the** |
| **SRIVARANONT"** | : | **United States)** |
| | : | |
| **EKASAK CHITCHAROEN** | : | **22 U.S.C. § 2778** |
| **also known as "JOE"** | : | **(Violation of the Arms Export Control Act)** |
| | : | |
| | : | **22 C.F.R. §§ 120-130** |
| | : | **(Violation of the International Traffic in** |
| | : | **Arms Regulations)** |
| | : | |
| | : | **18 U.S.C. § 554(a)** |
| | : | **(Smuggling Goods from the United States)** |
| | : | |
| | : | **18 U.S.C. § 1956(h)** |
| | : | **(Conspiracy to Launder Monetary** |
| | : | **Instruments)** |
| | : | |
| | : | **FORFEITURE:** |
| | : | |
| | : | |

## I N D I C T M E N T

The Grand Jury charges that:

## COUNT ONE

At all times material to this Indictment:

## Introduction

1.     The defendant, **APICHART SRIVARANON**, also known as "**TER**," also known as "**EISENHOWER TER**," also known as "**APICHART SRIVARANONT**," appears to be a Thai national with a permanent legal residence in Thailand, and whose last known residence was in Thailand.

2.     The defendant, **EKASAK CHITCHAROEN**, also known as "**JOE**," appears to be a Thai national with a permanent legal residence in Thailand, and whose last known residence was in Thailand.

## The Arms Export Control Act

3.     The Arms Export Control Act, Title 22, United States Code, Section 2778 ("AECA" or the "Act") authorized the President to control the export of defense articles and defense services from the United States. Unless a specific exception applies, the Act provided that no defense articles or defense services may be exported without a license for such export. 22 U.S.C. § 2778(b). The regulations promulgated pursuant to the Act were the International Traffic in Arms Regulations ("ITAR"), Title 22, Code of Federal Regulations, Sections 120 through 130. Section 2778(c) of the AECA established criminal penalties for any willful violation of Section 2778 or any rule or regulation thereunder, including the ITAR.

4.     The United States Department of State's Directorate of Defense Trade Controls (the "DDTC") administered the ITAR and regulated the export of defense articles. Under Section 123.1 of the ITAR, any person who intended to export a defense article had to obtain a license or other written approval from the DDTC before such export occurred. Pursuant to the ITAR, exporting, or attempting to export, a defense article from the United States without a license or other written approval from the DDTC was unlawful. 22 C.F.R. § 127.1(a)(1). The ITAR defined

2

exporting to include, among other things: "[s]ending or taking a defense article out of the United States in any manner." 22 C.F.R. § 120.17.

5.      At all times material to this Indictment, the DDTC was located in Washington, D.C.

6.      The term "defense article" referred to any item or technical data designated on the United States Munitions List ("USML"). 22 C.F.R. § 120.6. The USML set forth 21 categories of defense articles that were subject to export licensing controls by the DDTC. 22 C.F.R. § 121.1.

7.      The following firearms parts were defense articles ("firearms parts") designated on the USML in Category I(g) or I(h), and therefore could not and cannot be lawfully exported from the United States without a license or other written approval from the DDTC:

      a.   AR-15 Barrels

      b.   16.5" Keymod Handguards

      c.   .45 Caliber 10-Round Magazines

      d.   Glock 17 Threaded Barrel

      e.   9mm Threaded Barrel

      f.   AR-15 Magazines

8.      **SRIVARANON**, **CHITCHAROEN**, Co-conspirator One, Co-conspirator Two, Co-conspirator Three, and other co-conspirators known and unknown to the Grand Jury, never applied for, received, or possessed a license or other written approval from the DDTC to export defense articles from the United States.

### The Conspiracy

9.      From in or about January 2014 through the date of this Indictment, the exact dates being unknown to the Grand Jury, beginning in Thailand and elsewhere, in the extraterritorial jurisdiction of the United States, and pursuant to Title 18, United States Code, Section 3238, within

the venue of the United States District Court for the District of Columbia, the defendants,

**APICHART SRIVARANON**,
also known as "**TER**,"
also known as "**EISENHOWER TER**,"
also known as "**APICHART SRIVARANONT**," and
**EKASAK CHITCHAROEN**,
also known as "**JOE**,"

along with Co-conspirator One, Co-conspirator Two, Co-conspirator Three and others known and unknown to the Grand Jury, unlawfully, willfully and knowingly combined, conspired, confederated and agreed with one another, Co-conspirator One, Co-conspirator Two, Co-conspirator Three, and with others known and unknown to the Grand Jury (a) to defraud the United States, and (b) to commit offenses against the United States, that is, to knowingly and willfully export defense articles listed on the USML from the United States to Thailand, without having first obtained from the DDTC a license or other written approval for such export, in violation of Title 22, United States Code, Sections 2778(b)(2) and (c), and Title 22, Code of Federal Regulations, Sections 121.1, 123.1, and 127.1, and to fraudulently and knowingly export merchandise, articles, and objects contrary to a law of the United States, in violation of Title 18, United States Code, Section 554.

### Object of the Conspiracy

10.    It was an object of the conspiracy to obtain firearms parts in the United States that were on the USML and export them to Thailand without having first obtained the required license or written approval from the DDTC.

11.    It was further an object of the conspiracy to fraudulently and knowingly export firearms parts listed on the USML from the United States to Thailand.

12.    It was further an object of the conspiracy to conceal the prohibited transactions from detection by the United States government.

4

**The Manner and Means of the Conspiracy**

13.     It was part of the conspiracy that **SRIVARANON** and **CHITCHAROEN** and/or co-conspirators ordered firearms parts listed on the USML from United States-based firearms parts retailers and caused those firearms parts to ship to addresses in the United States where co-conspirators lived, visited, and/or conducted business.

14.     It was further part of the conspiracy that **SRIVARANON** and **CHITCHAROEN** used social media, email, and telephone communications to communicate with Co-conspirator One as well as others known and unknown to the Grand Jury in order to facilitate shipping firearms parts to Thailand.

15.     It was further part of the conspiracy that, at the direction of **SRIVARANON** and **CHITCHAROEN**, Co-conspirator One and others known and unknown to the Grand Jury repackaged the USML firearms parts in the United States; falsely labeled United States Postal Services PS Forms 2976 and Customs Declarations CN 22 (sender's declarations forms) by using fake names, in some instances provided by **SRIVARANON** and **CHITCHAROEN**, for return addresses; falsely declaring the contents of these packages (e.g., as spare parts, bicycle parts, fishing parts, and toy parts) and understating their value; and then shipping these USML firearms parts to Thailand via the United States Postal Service and private shipping companies.

**Overt Acts**

16.     On or about the dates listed below, in the District of Columbia and elsewhere, the defendants committed at least one of the following overt acts in furtherance of the conspiracy:

a.     On or around December 20, 2011, **SRIVARANON** communicated with **CHITCHAROEN** via Facebook to give **CHITCHAROEN** the home address for **SRIVARANON** in order for **CHITCHAROEN** to send firearms parts to **SRIVARANON**.

**SRIVARANON** provided an address in Thailand.

   b.  In the same series of communications via Facebook that continued through April 2012, **CHITCHAROEN** and **SRIVARANON** discussed ordering firearms parts from two separate firearms parts distributors located in the United States for delivery to **SRIVARANON** in Thailand.

   c.  On or around November 2, 2012, **SRIVARANON** had additional communications with **CHITCHAROEN** via Facebook regarding ordering firearms parts from two separate firearms parts distributors located in the United States. During that series of communications, **SRIVARANON** asked **CHITCHAROEN** if one of the American distributors located in the United States would take credit cards from overseas. **CHITCHAROEN** responded that if the credit card was from overseas, "you can use them all."

   d.  In the same series of communications, on or around November 20, 2012, **SRIVARANON** told **CHITCHAROEN** that one specific U.S. distributor "[does not] take any card from overseas."

   e.  On or around January 6, 2013, **SRIVARANON** communicated with **CHITCHAROEN** via Facebook to tell **CHITCHAROEN** that **SRIVARANON** was going to send firearms parts to **CHITCHAROEN**.

   f.  In that same series of communications, **SRIVARANON** and **CHITCHAROEN** discussed creating a rumor in order to raise the prices for firearms parts, in order for **SRIVARANON** and **CHITCHAROEN** to control the black market for the illegal purchase and export of firearms parts from the United States to Thailand.

   g.  In or around late 2013, **SRIVARANON** and **CHITCHAROEN** contacted Co-conspirator One via Facebook. Co-conspirator One was living in Thailand at the time but had

publicized his intent to travel to Las Vegas, Nevada for an event in January 2014.

        h.    On or around March 20, 2014, another co-conspirator, Co-conspirator Two, and an undercover law enforcement officer ("UC") met with **SRIVARANON** and another co-conspirator, Co-conspirator Three, in Bangkok, Thailand. During this meeting, **SRIVARANON** and Co-conspirator Three inquired as to whether the UC could ship firearms parts from the United States to **SRIVARANON** and Co-conspirator Three in Thailand.

        i.    In or around early 2014, **SRIVARANON** and **CHITCAHROEN** asked Co-conspirator One if Co-conspirator One would be willing to smuggle firearms parts from the United States to **SRIVARANON** and **CHITCHAROEN** in Thailand. More specifically, **SRIVARANON** and **CHITCHAROEN** asked Co-conspirator One to smuggle firearms in the following transactions:

        i.    On or around May 6, 2014, **CHITCHAROEN** communicated with Co-conspirator One via Facebook and told Co-conspirator One that **CHITCHAROEN** needed a "favor" from Co-conspirator One. **CHITCHAROEN** told Co-conspirator One that **CHITCHAROEN** needed to ship a firearms part from a U.S.-based distributor to Thailand.

        ii.    In the same series of communications, **CHITCHAROEN** stated that **CHITCHAROEN** did not want "police visiting [Co-conspirator One] at home."

        iii.    In the same series of communications, Co-conspirator One asked whether to ship the firearms parts from the United States to Thailand, or to physically bring the firearms parts with Co-conspirator One on the plane from the United States to Thailand. **CHITCHAROEN** told Co-conspirator One that "[i]f you are worry [sic] about getting caught, then just ship it by mail then. Use the USPS shipping out with protection envelope too."

        iv.    On or around May 6, 2014, **CHITCHAROEAN** communicated

7

with Co-conspirator One via Facebook and told Co-conspirator One that **CHITCHAROEN** needed about 20 items of magazines. Within the Facebook communications, **CHITCHAROEN** provided a link to a web page for AR-15 magazines from a supplier in the United States. On or around June 5, 2014, Co-conspirator One placed an order from the same supplier in the United States for 10 AR-15 magazines. On or around June 10, 2014, Co-conspirator One placed another order from the same supplier in the United States for 10 AR-15 magazines. Both orders were for delivery to Co-conspirator One's address in Las Vegas, Nevada, for eventual delivery to **CHITCHAROEN** in Thailand.

v.        On or around May 9, 2014, **CHITCHAROEN** communicated with Co-conspirator One via Facebook and told Co-conspirator One that **CHITCHAROEN** was ordering several firearms parts from a supplier in the United States worth a total of $879.00 for delivery to Co-conspirator One's address in Las Vegas, Nevada, for eventual delivery to **CHITCHAROEN** in Thailand.

vi.        In the same series of communications beginning on May 9, 2014, **CHITCHAROEN** gave instructions to Co-conspirator One regarding how to repackage and ship the firearms parts to **CHITCHAROEN** in Thailand. **CHITCHAROEN** sent photographs of U.S. Postal Service packages over Facebook to help explain the packaging instructions.

vii.        In the same series of communications, **CHITCHAROEN** told Co-conspirator One to "[d]eclare like motorcycle parts OR repair parts[. U]se total claim about under $100."

viii.        On or around May 16, 2014, **CHITCHAROEN** communicated with Co-conspirator One via Facebook and requested that Co-conspirator One order specific firearms parts for delivery to Co-conspirator One's address in Las Vegas, Nevada, for eventual delivery to

8

**CHITCHAROEN** in Thailand.

ix.     On or around May 20, 2014, Co-conspirator One communicated with **CHITCHAROEN** via Facebook about Co-conspirator One's attempt to purchase firearms parts from a United States supplier for eventual delivery to **CHITCHAROEN** in Thailand. Co-conspirator One explained that Co-conspirator One was having difficulty ordering the firearms parts. Co-conspirator One posted a photo during the course of the Facebook communication with **CHITCHAROEN**. The photo was an email dated May 19, 2014 that Co-conspirator One received from the American firearms parts supplier from which Co-conspirator One was attempting to make the purchase on behalf of **CHITCHAROEN**. The email referenced Co-conspirator One's attempted purchase. In the email, the supplier advised Co-conspirator One of the ITAR constraints and laws governing purchases of guns and gun parts and their exportation. The American firearms parts supplier required their customers to sign a document acknowledging the ITAR laws and the Arms Export Control Act. In the email, the supplier requested Co-conspirator One to sign and return the form to the supplier.

x.     In the same series of communications, Co-conspirator One asked **CHITCHAROEN** about the acknowledgement form. **CHITCHAROEN** downplayed Co-conspirator One's concerns over the acknowledgment form and told Co-conspirator One that **CHITCHAOREN** had "done it before" and that "everyone got" the acknowledgement form.

xi.     In the same series of communications, **CHITCHAROEN** told Co-conspirator One to label the packages of gun parts as "bike parts" or "toy parts."

xii.     On or around June 4, 2014, **SRIVARANON** ordered firearms parts from a supplier in the United States worth $236.99 for delivery to Co-conspirator One's address in Las Vegas, Nevada, for eventual delivery to **SRIVARANON** in Thailand.

9

xiii.     On or around June 5, 2014, **SRIVARANON** ordered firearms parts from a supplier in the United States worth $657.58 for delivery to Co-conspirator One's address in Las Vegas, Nevada, for eventual delivery to **SRIVARANON** in Thailand.

xiv.     On or around June 14, 2014, **SRIVARANON** communicated with Co-conspirator One via Facebook and told Co-conspirator One that **SRIVARANON** ordered several firearms parts worth a total of $1,386.67 for delivery to Co-conspirator One's address in Las Vegas, Nevada, for eventual delivery to **SRIVARANON** in Thailand.

xv.     On or around June 16, 2014, **CHITCHAROEN** communicated with Co-conspirator One via Facebook regarding a stored value card. **CHTICHAROEN** told Co-conspirator One that **CHITCHAROEN** sent $1,000 to Co-conspirator One to use on a stored value card.

xvi.     Co-conspirator One told law enforcement that Co-conspirator One would receive money from **CHITCHAROEN** and/or **SRIVARANON** in the form of deposits into Co-conspirator One's bank account in Thailand.  Co-conspirator One would withdraw U.S. dollars from automatic teller machines in the United States and use the dollars to purchase stored value cards.  Co-conspirator One would use the stored value cards to purchase firearms and firearms parts from the United States in order to export to Thailand.

xvii.     On or around June 17, 2014, **SRIVARANON** communicated with Co-conspirator One via Facebook and forwarded a screen shot to Co-conspirator One of an American firearms parts supplier's ITAR notification form.  This was the same form that Co-conspirator One had discussed with **CHITCHAROEN** on or around May 20, 2014.

xviii.     On or around June 17, 2014, **SRIVARANON** communicated with Co-conspirator One via Facebook and forwarded a screen shot to Co-conspirator One of a deposit

that **SRIVARANON** made to Co-conspirator One's bank account in Thailand in the amount of 26,119.00 Thai Baht. The transfer payment was made in order for Co-conspirator One to purchase firearms and firearms parts from American suppliers for export to **SRIVARANON** in Thailand.

xix.      On or around June 20, 2014, **SRIVARANON** communicated with Co-conspirator One via Facebook and provided Co-conspirator One specific instructions regarding how to package firearms parts purchased in the United States for delivery to Thailand. **SRIVARANON** included photographs of packages as examples of how to package the firearms parts.

xx.      On or around June 24, 2014, **SRIVARANON** communicated with Co-conspirator One via Facebook and forwarded a screen shot to Co-conspirator One of a deposit that **SRIVARANON** made to Co-conspirator One's bank account in Thailand in the amount of 3,640.00 Thai Baht. The transfer payment was made in order for Co-conspirator One to purchase firearms and firearms parts from American suppliers for export to **SRIVARANON** in Thailand.

xxi.      On or around June 24, 2014, **CHITCHAROEN** communicated with Co-conspirator One via Facebook and forwarded a screen shot to Co-conspirator One of a deposit that **CHITCHAROEN** made to Co-conspirator One's bank account in Thailand in the amount of 10,000.00 Thai Baht. The transfer payment was made in order for Co-conspirator One to purchase firearms and firearms parts from American suppliers for export to **CHITCHAROEN** in Thailand.

xxii.      On or around May 7, 2016, **CHITCHAROEN** communicated with Co-conspirator One via Facebook and requested Co-conspirator One to order several firearms parts from an American supplier for delivery to Co-conspirator One's address in Seattle, Washington for eventual delivery to **CHITCHAROEN** in Thailand through a shipping company located in Torrance, California.

11

xxiii.    On or around June 1, 2016, **CHITCHAROEN** communicated with Co-conspirator One via Facebook and requested Co-conspirator One to order several firearms parts from an American supplier for delivery to Co-conspirator One's address in Seattle, Washington for eventual delivery to **CHITCHAROEN** in Thailand through a shipping company located in Torrance, California.

(**Conspiracy to Defraud the United States and Conspiracy to Unlawfully Export Arms and Munitions and Smuggle Goods from the United States**, in violation of Title 18, United States Code, Section 371; Title 22, United States Code, Section 2778; Title 22 Code of Federal Regulations, Sections 120-130; Title 18, United States Code, Section 554(a)).

## COUNTS TWO through FOUR

17.    Paragraphs 1 through 15 of this Indictment are re-alleged as if fully set forth herein.

18.    On or about the dates specified, beginning in Thailand and elsewhere, and pursuant to Title 18, United States Code, Section 3238, within the venue of the United States District Court for the District of Columbia, the defendant

**APICHART SRIVARANON,**
also known as "**TER**,"
also known as "**EISENHOWER TER**,"
also known as "**APICHART SRIVARANONT**,"

along with Co-conspirator One, Co-conspirator Two, Co-conspirator Three, and others known and unknown to the Grand Jury, did willfully attempt to export and caused the export from the United States to Thailand of the firearms parts listed in the Counts below, all of which were and are designated as defense articles on the USML, the export of which was and is controlled under the Arms Export Control Act, without having first obtained from the DDTC the required license or other written approval for such export:

| COUNT | DATE | ACT IN EXECUTION |
|---|---|---|
| 2 | June 3, 2014 | Caused the attempted export to Thailand of one (1) 16.5" Keymod Handguard from Las Vegas, Nevada |
| 3 | June 5, 2014 | Caused the attempted export to Thailand of five (5) .45 caliber |

| | | |
|---|---|---|
| | | Magazines; one (1) Glock 17 Threaded Barrel; and one (1) 9mm Threaded Barrel from Las Vegas, Nevada |
| 4 | June 25, 2014 | Caused the attempted export to Thailand of one (1) Glock 17 Threaded barrel from Las Vegas, Nevada |

(**Unlawfully Exporting Arms and Munitions from the United States**, in violation of Title 22, United States Code, Section 2778(b) and (c); and Title 22, Code of Federal Regulations, Sections 121.1, 123.1, and 127.1).

## COUNTS FIVE through SEVEN

19.     Paragraphs 1 through 17 of this Indictment are re-alleged as if fully set forth herein.

20.     On or about the dates specified, beginning in Thailand and elsewhere, and pursuant to Title 18, United States Code, Section 3238, within the venue of the United States District Court for the District of Columbia, the defendant

### EKASAK CHITCHAROEN,
also known as "**JOE**,"

along with Co-conspirator One, Co-conspirator Two, Co-conspirator Three, and others known and unknown to the Grand Jury, did willfully attempt to export and caused the export from the United States to Thailand of the firearms parts listed in the Counts below, all of which were and are designated as defense articles on the USML, the export of which was and is controlled under the Arms Export Control Act, without having first obtained from the DDTC the required license or other written approval for such export:

| COUNT | DATE | ACT IN EXECUTION |
|---|---|---|
| 5 | May 9, 2014 | Caused the attempted export to Thailand of three (3) AR-15 Barrels from Las Vegas, Nevada |
| 6 | June 5, 2014 | Caused the attempted export to Thailand of ten (10) AR-15 25-round Magazines from Las Vegas, Nevada |
| 7 | June 10, 2014 | Caused the attempted export to Thailand of ten (10) AR-15 25-round Magazines from Las Vegas, Nevada |

(**Unlawfully Exporting Arms and Munitions from the United States**, in violation of Title 22, United States Code, Section 2778(b) and (c); and Title 22, Code of Federal Regulations, Sections 121.1, 123.1, and 127.1).

13

## COUNT EIGHT

21.     Paragraphs 1 through 19 of this Indictment are re-alleged as if fully set forth herein.

22.     From on or about January 2014 through the date of this Indictment, the exact dates being unknown to the Grand Jury, beginning in Thailand and elsewhere, in the extraterritorial jurisdiction of the United States, and pursuant to Title 18, United States Code, Sections 1956 and 3238, within the venue of the United States District Court for the District of Columbia, the defendants,

**APICHART SRIVARANON**,
also known as "**TER**,"
also known as "**EISENHOWER TER**,"
also known as "**APICHART SRIVARANONT**," and
**EKASAK CHITCHAROEN**,
also known as "**JOE**,"

along with Co-conspirator One, and others known and unknown to the Grand Jury, knowingly combined, conspired, confederated and agreed with one another, and with others known and unknown to violate Title 18, United States Code, Section 1956(a)(2)(A), that is, by transporting, transmitting, or transferring, or attempting to transport, transmit, or transfer a monetary instrument or funds to a place in the United States from or through a place outside the United States, that is, Thailand, with the intent to promote the carrying on of specified unlawful activity, that is, an offense under Section 554, relating to smuggling goods from the United States, and violations of the Arms Export Control Act.

(**Conspiracy to Launder Monetary Instruments**, in violation of Title 18, United States Code, Section 1956(h))

## FORFEITURE ALLEGATION

1.     Upon conviction of the offense alleged in Count One, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds

traceable to this offense, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and any arms or munitions of war or other articles, and any vessel, vehicle, or aircraft containing the same or which has been or is being used in exporting or attempting to export such arms or munitions of war or other articles, pursuant to 22 U.S.C. § 401. The United States will also seek a forfeiture money judgment against the defendants equal to the value of any property, real or personal, which constitutes or is derived from proceeds traceable to this offense.

2.      Upon conviction of the offense alleged in Count Twelve, the defendants shall forfeit to the United States any property, real or personal, involved in this offense, or any property traceable to such property, pursuant to 18 U.S.C. § 982(a)(1). The United States will also seek a forfeiture money judgment against the defendants equal to the value of any property, real or personal, involved in this offense, or any property traceable to such property.

3.      If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

       a.      cannot be located upon the exercise of due diligence;

       b.      has been transferred or sold to, or deposited with, a third party;

       c.      has been placed beyond the jurisdiction of the Court;

       d.      has been substantially diminished in value; or

       e.      has been commingled with other property that cannot be divided without difficulty;

the defendants shall forfeit to the United States any other property of the defendant, up to the

value of the property described above, pursuant to 21 U.S.C. § 853(p).

> **(Criminal Forfeiture,** in violation of Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p)).

A TRUE BILL

Chumby D. Phillips IKK

FOREPERSON

Attorney of the United States in
and for the District of Columbia

16